DECISION
In November of 1991 plaintiff, Haven Plumbing and Heating Company, Inc. filed a claim against Mutual Properties, Inc. and Nassa Construction Company, Inc. seeking damages on a book account in the amount of $24,772.18. The defendants responded with a counterclaim for $50,000 alleging that plaintiff's installation of a plumbing and heating system on defendant's property was incomplete, incorrect and deficient.
In 1993, Mutual Properties, Inc., et al, filed a separate action against Haven Plumbing and Heating alleging that Haven failed to provide design and construction services in a "skillful, careful, diligent, and workmanlike manner." As a result, plaintiff Mutual Properties, Inc. alleges apartments at the River's Edge Apartment Complex were not properly heated and plaintiff suffered both direct and consequential damages.
These aforementioned actions were consolidated for arbitration and, subsequently for a non-jury trial before this Court.
The contract (Exhibit 2) memorializing the parties' original agreement was signed by Stephen Soscia on behalf of Mutual Properties, and Anthony D'Arezzo and Joseph Joyce on behalf of JD Holding Company/Haven Plumbing and Heating. The latter were obligated, to furnish and install a complete hot water heating system for the 91-unit River's Edge Apartment Complex.
Mr. D'Arezzo, president of Haven Plumbing and Heating Company, a licensed master plumber, testified that Mr. Soscia first contacted him in the summer of 1988 with reference to the project. The two men had had prior business dealings, including Haven's installation of a complete heating system at the Cowesett Terrace Apartment Complex, another of Mutual's properties. Mr. D'Arezzo explained that Mr. Soscia was pleased, indeed excited with the "low amount" of heating expenses incurred at Cowesett Terrace. It was Mr. D'Arezzo's understanding that the River's Edge project "construction wise" was to be built in a fashion and of a quality similar to Cowesett Terrace. Mr. D'Arezzo testified that this was a "word-of-mouth" message "from a man (Soscia) who ate at my house." The same holds true for Mr. Soscia's instruction to Mr. D'Arezzo to "do the same thing as at Cowesett Terrace."
When plaintiff attempted to collect the balance due on book account for its services, defendant countered that the heating system was defective and inadequate. With respect to the latter allegation, defendant complains that because the boilers and piping were erroneously sized, insufficient heat was delivered to the apartment units.
The selection of boiler size and piping diameters was entrusted to Ardente Plumbing. Ardente was furnished with blueprints of the complex and information detailing the nature and quality of the proposed construction. This would allow Ardente to calculate the amount of BTU loss and size the heating system components accordingly. Plaintiff decided, among other things, what "route" the plumbing would take, what kind of valves were required, where thermostats would be located and how the zones would be arranged.
Defendant counterclaim advanced its allegations at trial largely through the testimony of engineer William Schlageter. Mr. Schlageter did not view the premises in question until eight years after construction was completed. He concluded that the boilers were large enough to generate sufficient heat; but the pump and the pipes delivering the hot water to the units were too small. Although Mr. Schlageter had information concerning the manner of installation from construction plans and drawings and from Stephen Soscia, he was unable to observe much of the piping behind the plaster. He said he was "giving an educated guess as to where the heat lines [were]." Nonetheless, he opined that the pump, the "heart of the system", should handle 92 g.p.m. (gallons per minute) instead of the present 45 gallons per minute. The branch piping, which is 1/2 inch in diameter must be replaced with 3/4 inch piping. (See Exh. "Q" for suggested areas of repiping.) The witness also testified in detail regarding his other concerns including: the absence of dialectric unions, (which prevent dissimilar metals from corroding), the absence of air vents, the non-adjustability of the water pressure regulating valve, the lack of balancing valves, the lack of insulation and the location of the thermostats. Mr. Schlageter's ultimate conclusion was that the system had to be redesigned and repiped at a cost of approximately $205,000 (construction costs alone would be $92,604 — see Exhibit "P" and testimony of Dennis Higgins.)
Plaintiff maintains that the heating system problems result not from any substandard performance on its part, but rather, from the inferior manner in which River's Edge was constructed. To explain why this is so. Haven presented the expert testimony of Anthony A. Nunes, former president of A. A. Nunes, Inc., a general contracting firm. Mr. Nunes had been in the building business since 1953, and before that, worked for his father, who was in the same profession. Mr. Nunes is very familiar with heating systems, and has worked on a number of buildings similar to River's Edge and visited both it and the predecessor project, Cowesett Terrace. One need not be an expert, Mr. Nunes testified, to observe the "very obvious" inferior construction and design of River's Edge as compared to Cowesett Terrace.
The orientation of the walkways at River's Edge east to west and west/northwest to east create a breezeway effect which results in "enormous heat loss . . . even in good construction." Cowesett Terrace was not designed in this manner. Photographs of River's Edge reveal that vinyl siding was improperly installed allowing infiltration of cold air and escape of heated air. The interior of the boiler room consists of sheet rock which does not even meet building code requirements. Mr. Nunes concluded, based upon his vast experience and expertise, that the boiler and attendant heating system were "very adequate to do the job if the buildings were properly insulated." Consistent with insufficient insulation, Mr. Nunes felt a "considerable draft" coming in from the electrical outlets, and a "tremendous wind" when the hatch to the attic was opened.
Mutual's principal, Stephen Soscia, testified that until this controversy, he enjoyed a "long and excellent relationship" with Haven. Prior to the lawsuit, Mr. D'Arezzo was "very responsive" to calls for assistance at River's Edge, including a Christmas Eve repair visit. Mr. Soscia maintains that the construction of River's Edge and Cowesett Terrace are "similar". He attributes the inefficiency and costliness of the River's Edge heating system to the "defective" system itself rather than any inferiority of construction.
The combined experience of Mr. D'Arezzo and Mr. Nunes exceeds 80 years in their respective professions. The Court assigns great weight to their expertise and, importantly, to their credibility. The evidence simply does not support a conclusion that Haven performed substandardly or in any way breached an agreement to install a particular kind of system. The Court concurs with plaintiff's contention, supported by expert testimony, which the Court endorses, that the River's Edge complex was not of the quality of Cowesett Terrace.
Finding that plaintiff has proven its case, the Court awards it judgment on the remaining balance of the River's Edge contract in the amount of $16,703.00 (as well as the stipulated amount of $15,974.43). Interest shall be calculated at the statutory rate and shall be suspended as of the last date of in-court proceedings, May 6, 1998. Defendants' counterclaim is denied. Plaintiff's counsel shall prepare an order conforming to this decision.